Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| C.B., individually and on behalf of R.B. a minor,<br><br>            Plaintiff,<br>vs.<br><br>BLUECROSS BLUESHIELD of ILLINOIS, and the MONDOLEZ GLOBAL LLC GROUP BENEFITS PLAN.<br><br>            Defendants. | COMPLAINT<br><br>Case No. 1:22-cv-00144 – JCB<br><br>Magistrate Judge Jared C. Bennett |

Plaintiff C.B., individually and on behalf of R.B. a minor, through her undersigned counsel, complains and alleges against Defendants BlueCross BlueShield of Illinois ("BCBSIL"), and the Mondolez Global LLC Group Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. C.B. and R.B. are natural persons residing in Union County, New Jersey. C.B. is R.B.'s mother.

1

2. BCBSIL is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). C.B. was a participant in the Plan and R.B. was a beneficiary of the Plan at all relevant times. C.B. and R.B. continue to be participants and beneficiaries of the Plan.

4. R.B. received medical care and treatment at Triumph Youth Services ("Triumph") from October 22, 2019, to September 9, 2020. Triumph is a licensed residential treatment facility located in Box Elder County, Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. BCBSIL denied claims for payment of R.B.'s medical expenses in connection with his treatment at Triumph.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BCBSIL does business in Utah, directly and through its network of affiliates, and the treatment at issue took place in Utah.

8. In addition, C.B. has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which she will be responsible to pay, which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both her and R.B.'s privacy will be preserved.

9. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Triumph

10. R.B. was admitted to Triumph on October 22, 2019, due to a history of severe anxiety and depression, suicidal thoughts, and aggressive behaviors which had not been able to be resolved at other levels of care. The first four days of treatment were initially authorized by BCBSIL (although incorrectly labeled as acute) in a letter dated October 29, 2019.

11. In a series of explanation of benefits ("EOB") statements, BCBSIL denied payment for R.B.'s treatment under the following denial codes:

> 273: Service not covered by contract for this type of provider.

> 273: Services performed were not within the scope of the provider's practice, license or applicable medical standards guidelines.

> 360: Claim denied based on information provided. Complete medical records should be provided for reconsideration of this claim.

> 360: Additional information has been requested to complete the processing of this claim. Consideration of this claim cannot be made until this information is received.

> 736: Room and board charges not covered for days not approved by the Medical Services Advisor. Provider does not participate in the Community Blue/Preferred Ancillary Network (PAN). Patient is responsible for payment of these charges.
>
> 411: Charge exceeds Usual and Customary. Amount is provider write-off for participating providers; refer to the Fee Schedule for pricing allowance.

12. On December 11, 2020, C.B. submitted an appeal for the denial of payment for R.B.'s treatment from his admission on October 22, 2019, through his discharge on September 9, 2020.

13. C.B. stated that the first few days of R.B.'s treatment had initially been approved by BCBSIL but had mistakenly classified as an acute level of care. She stated that this error was eventually resolved but BCBSIL continued to deny payment due to factors such as a lack of nursing staff on site 24 hours a day, 7 days a week. C.B. argued that this requirement was also an acute level requirement and should not have been imposed on R.B.'s residential treatment care.

14. She reminded BCBSIL that she was entitled to certain protections under ERISA, including a full, fair, and thorough review using appropriately qualified reviewers which took into account all of the information she provided, gave her the specific reason(s) for the adverse determination, referenced the specific plan provisions on which the denial was based, and gave her the information necessary to perfect the claim.

15. She asked that the reviewer have experience with MHPAEA and also asked to be provided with a physical copy of all documentation related to the appeal decision and the initial denial EOB's including any internal case notes or reports.

16. C.B. noted that she had not been provided with a consistent denial rationale and had been offered multiple justifications for the denial of payment. She stated that it seemed BCBSIL was improperly stacking denial rationales in an attempt to "hedge their bets"

and to obscure the true justification for the denial. She stated that this made it exceptionally difficult to effectively appeal the denials and to properly advocate on her son's behalf.

17. She argued that coverage was available for R.B.'s treatment under the terms of the Plan and pointed out that as a licensed residential treatment center, Triumph met the Plan's definition of a "Provider" and R.B.'s treatment at Triumph should have been approved on that basis alone.

18. C.B. wrote that some of the denial EOB's she had received requested additional records, she attached an updated copy of R.B.'s medical records with the appeal. These records documented instances such as R.B. self-harming with a pair of scissors while in treatment or threatening to run away from the program.

19. She stated that she had also been told in EOB's that the services at Triumph were not within the "scope of the provider's practice, license or applicable medical standards guidelines." She contended that this assertion was false and noted that Triumph was licensed by the State of Utah to provide residential treatment services to adolescents and was compliant with all applicable governing state regulations.

20. C.B. stated that she had also received a verbal denial which stated that coverage had been denied due to a lack of 24/7 onsite nursing care. She contended that this requirement was overly restrictive and pointed out that the State of Utah did not require this for residential treatment centers. She wrote that this requirement likely constituted a non-quantitative treatment limitation in violation of MHPAEA.

21. She stated that MHPAEA compelled insurers to offer benefits for mental health benefits "at parity" with analogous medical or surgical benefits. C.B. identified skilled nursing,

hospice, and inpatient rehabilitation facilities as some of the medical or surgical analogues to the treatment R.B. received.

22. She included a table with the information below to provide evidence of the disparate requirements applied to residential treatment compared to its medical/surgical analogues.

| Facility Type | License | Scope of License | 24-hour Nursing | Credentialed | Accredited |
|---|---|---|---|---|---|
| Residential Treatment | Yes | Yes | Yes | Yes | Yes |
| Skilled Nursing | Yes | Yes | No | No | No |
| Long-term Care | No | No | No | No | No |
| Hospice | Yes | Yes | No | No | No |
| Rehabilitation | No | No | No | No | No |

23. She argued that on their face, the requirements applied to residential treatment facilities were stricter than those imposed on analogous medical or surgical services. She pointed out that while residential treatment centers had to meet all five of these requirements, only skilled nursing and hospice care were required to meet any of them, and in that case it was only two requirements related to licensure while requirements such as accreditation or 24 hour nursing care were specifically applied only to residential treatment facilities.

24. She argued that the Plan applied restrictions to residential treatment care, including restrictions on medical management standards as well as restrictions based on geographic location, facility type, provider specialty, and other criteria which it did not equally apply to analogous medical or surgical services.

25. C.B. wrote that she was entitled to relief under MHPAEA as she had demonstrated that the Plan was subject to MHPAEA, that the Plan offered both medical/surgical benefits as well as mental health/substance use benefits, that the appropriate analogues to R.B.'s residential treatment included skilled nursing, rehabilitation, and hospice facilities, and

6

that the requirements imposed on R.B.'s residential treatment were more restrictive than those imposed on analogous medical or surgical services.

26. She asked BCBSIL to conduct a parity compliance analysis on the terms of the Plan and directed it to provide her with physical copies of any documentation used in this analysis.

27. She asked BCBSIL to directly respond to all of the issues she had raised during the appeals process, and if denial was maintained to directly address why BCBSIL felt that MHPAEA was not applicable to R.B.'s treatment.

28. In the event the denial was upheld she also asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination, as well as their medical or surgical equivalents (whether or not these were used to evaluate the claim), as well as reports and opinions of any physician or other professional who evaluated the claim, as well as their the names, qualifications, and denial rates. (collectively the "Plan Documents")

29. She requested that in the event BCBSIL was not in possession of these documents or was not acting on behalf of the Plan Administrator in this regard that it forward her request to the appropriate entity.

30. In a letter dated January 15, 2021, BCBSIL upheld the denial of payment for R.B.'s treatment. The letter gave the following justification for the denial:

> The claim for dates of service October 22, 2019 - October 25, 2019, 93105549C560H 2,200.00 was processed at the out of network benefit level and applied towards the out of pocket maximum. The claim for dates of services October 26, 2019 – October 31, 2019, 93105550C780H 3,300 was also processed

at the out of network benefit level (411- Charge exceeds Usual and Customary). There was approval initially for October 22, 2019 - October 25, 2019 4 days. A correction was made and the services were not approved due to the facility does not meet the definition of a residential treatment [sic] with confirmation of 24 hour nursing presence and M.D. access is required.

The claims for dates of services November 1, 2019 - May 31, 2020 and September 1, 2020 - September 9, 2020 denied 273 - Services are not covered by contract for this type of provider. The services are not covered due to the facility does not meet the definition of a residential treatment [sic] with confirmation of 24-hour nursing presence and M.D. access is required.

The claims for June 1, 2020 - June 30, 2020 021855939Y60H 16,500.00 July 1, 2020 - July 31, 2020 0202021855938Y70H 17,050.00 and August 1, 2020 - August 31, 2020 026055157D70H 17,050.00 were denied 360- Medical records required. Medical records were received and reviewed. The claims were not adjusted with the correct denial after records were reviewed. These claims will be adjusted to deny 273- Services are not covered by contract for this type of provider. The services are not covered due to the facility does not meet the definition of a residential treatment [sic] with confirmation of 24-hour nursing presence and M.D. access is required.

Based on the provisions, we have determined that the claims have been correctly processed according to the billing information and benefit provisions for this plan. At this time, no additional reimbursement is available.

We regret our outcome could not be more favorable. …
Please refer to the "DEFINITIONS" section which explains:

RESIDENTIAL TREATMENT CENTER… means a facility setting offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision. structure and is licensed by the appropriate state and local authority to provide such service. It does not include halfway houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facilities. Patients are medically monitored with 24 hour medical availability and 24 hour onsite nursing service for patient with Mental Illness and/or Substance Use Disorders. Any Mental Illness and/or Substance Use Disorder Residential Treatment Center must be licensed in the state where it is located, or accredited by a national organization that is recognized by the Claim Administrator as set forth in its current credentialing policy, and otherwise meets all other credentialing requirements set forth in such policy."

Also, please refer to the "EXCLUSIONS - WHAT IS NOT COVERED" section, which explains:

> ---Behavioral health services provided at behavioral modification facilities, boot camps, emotional group academies, military schools, therapeutic boarding schools, wilderness programs, halfway houses, and group homes, except for Covered Services provided by appropriate Providers as defined in this benefit booklet. (emphasis in original)

31. The Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

32. The denial of benefits for R.B.'s treatment was a breach of contract and caused C.B. to incur medical expenses that should have been paid by the Plan in an amount totaling over $165,000.

33. BCBSIL failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of C.B.'s request.

## FIRST CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

34. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSIL's fiduciary duties.

35. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

36. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also

9

makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

37. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

38. The medical necessity criteria used by BCBSIL for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

39. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for R.B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

40. For none of these types of treatment does BCBSIL exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an accreditation requirement for skilled nursing or hospice care. However, BCBSIL does impose the additional hurdle of accreditation as well as other unique requirements for residential treatment to be approved.

41. When BCBSIL and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. BCBSIL and the Plan evaluated R.B.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

42. C.B. included a table which clearly and concisely listed examples present in the facial terms of C.B.'s insurance policy which showed BCBSIL discriminating against residential treatment centers by imposing requirements which only applied to these mental healthcare facilities.

43. After it revised its various denial rationales, BCBSIL's denial of payment was predicated almost entirely on requirements which were only applied to residential treatment care. For instance, BCBSIL largely excluded payment due to a lack of "confirmation of 24-hour nursing presence and M.D. access."

44. C.B. cedes the fact that Triumph does not provide 24-hour nursing care. C.B. also contends that this requirement is a profound deviation from generally accepted standards of medical practice for residential treatment care, and this single requirement effectively excludes most residential treatment facilities from the possibility of coverage regardless of licensure, accreditation, or other status.

45. Defendants' use of the 24/7 nursing provision for residential treatment is a violation of MHPAEA and is therefore rendered moot and unenforceable. C.B. seeks a reformation of the terms of the insurance policy and removal of the offending language.

46. As C.B. pointed out, the insurance policy does not require even skilled nursing facilities to have 24/7 nursing presence, even though it is significantly more likely an individual in a skilled nursing facility would require 24/7 nursing care.

47. Because of this, state law, funding, or licensure requirements sometimes mandate that an intermediate level medical facility have nursing staff on-site 24/7. Even in these cases, a MHPAEA violation can take place.

48. The MHPAEA violation occurs because 24/7 onsite nursing care is often part of generally accepted standards of care for intermediate level inpatient medical and surgical treatment but does not fall within generally accepted standards of care and is neither expected nor required for residential treatment facilities.

49. In this manner, the effect of imposing even a facially neutral 24/7 onsite nursing requirement on residential treatment centers is to significantly limit access to coverage for intermediate level mental health and substance use disorder treatment compared to coverage for intermediate level medical and surgical treatment in a way that violates MHPAEA.

50. BCBSIL's policies place its insureds in the unenviable position of delaying treatment until an appropriate residential facility with 24 hour nursing care is found (if any such facility even exists), all the while disregarding the medical opinions of their child's treatment team and placing their child's wellbeing in serious jeopardy, or putting their child in the treatment environment they require but running the risk that BCBSIL will not pay due to an absence of 24 hour onsite nurses.

51. Generally accepted standards of care between mental health and substance use disorder treatment facilities and skilled nursing and inpatient rehabilitation facilities are distinct by necessity.

52. By requiring 24 hour onsite nurses for all residential treatment, BCBSIL is able to effectually exclude coverage for all, or nearly all, residential treatment facilities while giving the appearance to its insureds that residential treatment is a covered benefit.

53. BCBSIL's comparatively lax standards for intermediate level medical care allow it to approve coverage at its discretion for essentially all licensed skilled nursing facilities.

54. At the same time, BCBSIL's 24/7 nursing requirement for residential treatment removes that discretion and all but guarantees a denial of benefits, even in the most extreme cases where the medical necessity of treatment is undeniable.

55. Triumph is a licensed residential treatment center under Utah law and meets the appropriate requirements and regulations to maintain that licensure. These requirements are set by state regulatory agencies to ensure that residential treatment care takes place in a safe, effective, and therapeutic environment.

56. On information and belief, no licensing, accreditation, or regulatory agency, in Utah or otherwise, makes licensure, accreditation, or certification for residential treatment contingent on 24 hour nursing availability or similar factors.

57. The actions of BCBSIL and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and

coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

58. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSIL, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

59. BCBSIL and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that BCBSIL and the Plan were not in compliance with MHPAEA.

60. In fact, despite C.B.'s request that BCBSIL and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, BCBSIL and the Plan have not provided C.B. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, BCBSIL and the Plan have not provided C.B. with any information about the results of this analysis.

61. The violations of MHPAEA by BCBSIL and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the facility eligibility criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for her loss arising out of the Defendants' violation of MHPAEA.

## SECOND CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

62. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSIL, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

63. BCBSIL and the Plan failed to provide coverage for R.B.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

64. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiff in the pre-litigation appeal process. 29 U.S.C. §1133(2).

65. The denial letters produced by BCBSIL do little to elucidate whether BCBSIL conducted a meaningful analysis of the Plaintiff's appeals or whether it provided them with the "full and fair review" to which she is entitled. BCBSIL failed to substantively respond to the issues presented in C.B.'s appeals and did not meaningfully address the arguments or concerns that she raised during the appeals process.

66. BCBSIL and the agents of the Plan breached their fiduciary duties to R.B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in R.B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of R.B.'s claims.

67. The actions of BCBSIL and the Plan in failing to provide coverage for R.B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

68. In accordance with the facts stated above, C.B. requests payment for R.B.'s treatment at Triumph, or in the alternative, if the Court finds that MHPAEA has been violated, an order to reform policy language to ensure compliance with MHPAEA and a remand for

further consideration based on the updated language.

69. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for R.B.'s medically necessary treatment at Triumph under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's First Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 21st day of October, 2022.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiff

County of Plaintiff's Residence:
Union County, New Jersey